Opinion issued November 18, 2004









                                              

In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00279-CV




J. MICHAEL EPSTEIN, INDIVIDUALLY AND AS TRUSTEE UNDER
THE WILL OF JULIUS EPSTEIN, Appellant

V.

JOHN A. HUTCHISON III, SUCCESSOR GUARDIAN OF THE ESTATE
OF ALTA ESPTEIN, AN INCAPACITATED PERSON, Appellee




On Appeal from Probate Court No. 2
Harris County, TexasTrial Court Cause No. 274,652




MEMORANDUM OPINION
          This is the third appeal arising from the same guardianship matter. Appellant,
J. Michael Epstein (“Michael”), appeals from an order approving a settlement for
Michael’s incapacitated mother, Alta J. Epstein (“Alta”), the guardian of whose estate
is John A. Hutchison III. We consider whether the trial court abused its discretion in
approving the settlement. We affirm.
Background
          Michael sued Alta, alleging that she had committed various wrongful acts as
trustee of testamentary trusts established under the will of Julius Epstein, Michael’s
father and Alta’s late husband. Alta was later declared incapacitated from
Alzheimer’s disease. Michael became the sole trustee of the testamentary trusts. 
Hutchison eventually became the guardian of Alta’s estate. 
          Alta owned a shopping center (“the Memorial shopping center”). One of her
tenants was A-1 Cleaners (“A-1”), a dry-cleaning business. There was evidence that
A-1’s business generated pollution that contaminated the Memorial shopping center
and also the groundwater that flowed onto nearby Town and Country Village
Shopping Center and toward or into a nearby residential neighborhood. On July 13,
2001, the owners of the Town and Country property (“the T&C owners”) sued Alta,
as owner and operator of the Memorial shopping center, for violations of federal and
state environmental laws, for gross negligence, and for nuisance arising from the A-1
contamination.


 Hutchison and the T&C owners negotiated a settlement. Hutchison
sought the trial court’s approval; Michael opposed the settlement’s approval. After
hearing evidence and reviewing briefing, the trial court approved the settlement.
Approval of the Settlement
          “On written application to the court and when a guardian of the estate deems
it is in the best interest of the estate, the guardian may, if authorized by an order of
the court: . . . make a compromise or a settlement in relation to property or a claim in
dispute or litigation; . . . .” Tex. Prob. Code Ann. § 774(a)(4) (Vernon Supp. 2004-2005). The trial court expressly found that the settlement was fair, reasonable, and
in Alta’s best interest. We review a trial court’s approval of a settlement involving
a ward for abuse of discretion. Cf. Crouch v. Tenneco, Inc., 853 S.W.2d 643, 646
(Tex. App.—Waco 1993, writ denied) (applying abuse-of-discretion standard to
court’s approval of settlement in context of class action).
A.      The Settlement’s Terms
          The settlement, executed in six documents, provided in pertinent part as
follows: the T&C owners released their claims against Alta’s estate arising from the
A-1 contamination. The T&C owners would use their best efforts (1) to remediate
the contamination at the Memorial shopping center, using the environmental
contractor and some of the remediation equipment that was already being used in the
remediation of their own property, and (2) to obtain a final certificate of completion
from the Texas Environmental Quality Commission (“TEQC”).


 In exchange, Alta’s
estate would reimburse (with interest) the T&C owners the funds that they expended
to remediate the Memorial shopping center, up to a maximum of $580,000; Alta’s
estate would borrow the reimbursement funds under a note, backed by a deed of trust,
from the T&C owners. The estate would pay the interest on any sums advanced
under the note until six months after the earlier of the issuance of a TEQC final
certificate of completion or five years after the note’s execution, at which point the
note would become due. The note also allowed Alta’s estate to borrow up to $85,000
from the T&C owners to pursue A-1 or any other potentially responsible parties. The
T&C owners would assign any claims that they had against A-1 to Hutchison, and
they would allow their environmental contractor to assist Alta’s estate in prosecuting
claims against responsible third parties. The estate assigned rents from the Memorial
shopping center to the T&C owners, but retained a license to collect and to use the
rents, provided that the rents be used to pay the note, taxes, and costs before they
could be used for other purposes, such as Alta’s support. 
B.      Michael’s Objections
          1.       Limitations
          Under issue two, Michael first contends that the trial court abused its discretion
in approving the settlement because the statute of limitations absolutely barred the
T&C owners’ claims against the estate. Specifically, Michael relies on evidence that
the T&C owners’ remediation contractors first discovered contaminant in two off-site
monitoring wells located between the T&C owners’ property and A-1 in late 1998 or
early 1999. The T&C owners did not file suit until July 2001.
          Michael relies on a line of authority providing that the statute of limitations for
a “‘direct invasion of one’s property of a permanent character . . . begins to run from
the date of the invasion . . . .’” Tennessee Gas Transmission Co. v. Fromme, 269
S.W.2d 336, 337 (Tex. 1954) (quoting 28 Tex. Jur. 149, Limitation of Actions, § 66)
(holding that negligence cause of action accrued when plaintiff’s legal rights were
invaded by contaminated water’s first flowing upon plaintiff’s land). Assuming
without deciding, as Michael argues and Hutchison contests, that a two-year statute
of limitations applied to all of the T&C owners’ causes of action, this line of authority
does not support Michael. The evidence that the T&C owners knew of the A-1
contamination in 1999 would not trigger the statute of limitations under Michael’s
authority because the contamination was detected at off-site wells between their
property and A-1’s facility, not on their property. The evidence also indicated that
the A-1 contamination had not yet entered the T&C owners’ property as of early
2000, fewer than two years before the T&C owners filed suit. Accordingly, assuming
that a two-year limitations period applied, the trial court reasonably could have
concluded that the T&C owners’ claims did not accrue before early 2000 and,
accordingly, that limitations did not bar those claims.
          2.       The T&C Owners’ Alleged Contributory Acts
          Michael next contends, under issue two, that the trial court abused its discretion
in approving the settlement because the T&C owners’ remediation system sucked the
A-1 contaminants onto their own property. Michael does not explain, however, how
the T&C owners could have remediated their property without using the remediation
method that they used, which had the incidental effect of pulling off-site ground water
onto their site. Neither does he explain why the T&C owners would not be entitled
to remediate their own property—especially when their remediation plan was
approved by the TEQC—even if pulling some off-site contamination toward their
property was a necessary consequence. Moreover, the trial court reasonably could
have viewed the T&C owners’ responsibility for drawing the A-1 pollution onto their
own property as a contested, fact-dependent causation or liability issue that would
have required litigation; the trial court also could have believed Hutchison’s
testimony that the estate could not afford such litigation. 
          3.       The Absolute Nature of the Estate’s Obligation
          Michael further asserts, under issue two, that the trial court abused its
discretion in approving the settlement because “the Ward’s payment obligation is
absolute and fixed in time, while the obligation of [the T&C owners] to remediate is
not.” Specifically, Michael complains that the settlement agreement requires the
T&C owners only to use their best efforts to remediate, while the agreement requires
the estate to pay the note at a date certain. 
          Hutchison testified that he tried to negotiate an absolute obligation to
remediate, but that the T&C owners would not agree—in part because they could not
control the TEQC’s issuance of a final certificate; however, Hutchison testified that
he believed that the remediation could be completed within the five-year time frame. 
Hutchison’s testimony was supported by that of the T&C owners’ remediation
contractor, who testified that he believed that remediation would be fully completed
within the five-year period. Furthermore, Hutchison testified that it would be in the
T&C owners’ interest to clean up the Memorial shopping center because that property
was contaminating theirs, and they could not get a TEQC certificate of completion
until their own property was sufficiently cleaned. Additionally, the T&C owners’
environmental attorney testified that contaminated property could be refinanced, even
at the same rate as that at which non-contaminated property could be financed, as
long as “a remedy [was] in place that [was] working,” and that he knew of about “two
dozen” banks that would do so.


 Hutchison also testified that two experts had advised
him that the property could be financed once the clean-up plan was in place and
progressing. 
          Thus, the trial court reasonably could have believed that it was in Alta’s best
interest to settle, despite not obtaining an absolute remediation obligation, because
the experts predicted that remediation would be fully complete before the note
became due and because refinancing would be available.
          4.       Defense Costs
          Michael next argues, under issue two, that the trial court abused its discretion
in approving the settlement because the estate’s expenses of defending the T&C
owners’ environmental lawsuit would allegedly be minimal. Specifically, Michael
argues that “the only defense costs” to the estate “would be the legal arguments”
because all parties to the suit “agree that A-1 is the culprit.”


 Michael’s challenge
overlooks testimony from Hutchison that the estate could not afford what he and his
environmental counsel concluded would be the high expenses of defending against
the T&C owners’ claims. Moreover, the settlement agreement provided for the estate
to borrow up to $85,000 to prosecute claims against potentially responsible parties,
and Hutchison testified that that amount would be a “drop in the bucket” compared
to the attorneys’ and experts’ fees that could accrue in such a suit. Accordingly, the
trial court reasonably could have concluded that the potentially high costs of
defending against the T&C owners’ claims justified settlement.
          5.       Vicarious Liability and Statutory Claims
          Michael further argues, under issue two, that the trial court abused its
discretion in approving the settlement because “there is no common-law vicarious
liability of a landlord (ward) for the acts of its tenant (A-1), and the statutory
environmental cost recovery statutes are not prospective.”
          The T&C owners asserted, among other claims, claims for recovery of
remediation costs under Texas and federal statutes. See 42 U.S.C.S. § 9607(a)(1), (2)
(1997) [hereinafter “CERCLA”]; Tex. Hum. Res. Code Ann. § 361.344(a) (Vernon
2001) [hereinafter “SWDA”]. SWDA section 361.344 provides in pertinent part that
[a] person who conducts a removal or remedial action that is approved
by the commission and is necessary to address a release or threatened
release may bring suit . . . to recover the reasonable and necessary costs
of that action and other costs as the court, in its discretion, considers
reasonable. 

Tex. Hum. Res. Code Ann. § 361.344(a). Michael’s only appellate argument
concerning the SWDA claim is that it “fails because . . . there is no plan approved by
any regulatory body to clean up . . . A-1 Cleaners’ [contamination] plume” and
“section 361.344 refers to removal or remediation action that is approved by the
TEQC,” and “no such plan currently exists . . . .” This argument completely
overlooks that the T&C owners had or would incur costs in cleaning up the A-1
contamination that migrated onto their site and that the TEQC had already approved
a remediation plan for the T&C owners’ property. Moreover, if the current TEQC-approved plan somehow did not cover the clean-up of the new contamination,
Michael does not explain what would prevent the T&C owners from obtaining TEQC
approval to clean the A-1 pollution as it migrated onto their property.
          Michael’s only appellate argument concerning the CERCLA claims is that
“jurisdiction for this federal cause of action exclusively is in the federal courts.” 
Again, even assuming that this is true, Michael does not explain what, besides a
settlement, would prevent the T&C owners from filing their CERCLA claims against
the estate in federal court.
          Finally, we note that the T&C owners’ environmental attorney indicated that
his clients’ theory of liability against the estate was that it was the owner of a facility
from which hazardous substances were released and was thus jointly and severally
liable with A-1 for the clean up. See 42 U.S.C. § 9607(a)(1), (2) (providing that “the
owner . . . of a . . . facility . . .” or “any person who at the time of disposal . . . owned
or operated any facility at which such substances were disposed of . . .” is liable for
certain costs).
          The trial court would thus have been within its discretion in rejecting these
challenges to the settlement.
          6.       Recourse Under the Note
          In a final argument under issue two, Michael asserts that the trial court abused
its discretion in approving the settlement because every asset in Alta’s estate was
allegedly at risk to satisfy the note should she default. No one disputed below that
the note was “recourse.” However, there was also testimony, set out above and
below, that the experts believed that remediation could be completed before the note
would come due, allowing for the Memorial shopping center’s sale to satisfy the note
or for refinancing; that refininancing could occur even if the remediation was not
fully complete within five years; and that the best estimate of the actual cost to
remediate the Memorial shopping center was $300,000 to $400,000, although that
price range could not be guaranteed because of possibly higher operating costs. 
Accordingly, the trial court reasonably could have rejected this challenge to the
settlement.
          7.       Probate Code Section 805
          Finally, under issue one, Michael asserts that the trial court abused its
discretion in “surrendering the protection of Probate Code section 805” because
payment of the settlement allegedly would “increasingly reduce the ward’s estate,
which is already inadequate for her support and which provides no protection from
ultimate loss of the [Memorial shopping center] property.”
          Probate Code Section 805, entitled “Order of Payment of Claims,” provides:
(a)The guardian shall pay a claim against the estate of the guardian’s
ward that has been allowed and approved or established by suit,
as soon as practicable, in the following order, except as provided
by Subsection (b) of this section:
 
(1)expenses for the care, maintenance, and education of the
ward or the ward’s dependents;
 
(2)funeral expenses of the ward and expenses of the ward’s
last illness, if the guardianship is kept open after the death
of the ward as provided under this chapter, except that any
claim against the estate of a ward that has been allowed
and approved or established by suit before the death of the
ward shall be paid before the funeral expenses and
expenses of the last illness;
 
(3)expenses of administration;
 
(4)other claims against the ward or the ward’s estate.
 
(b)If the estate is insolvent, the guardian shall give first priority to
the payment of a claim relating to the administration of the
guardianship. The guardian shall pay other claims against the
ward’s estate in the order prescribed by Subsection (a).

Tex. Prob. Code Ann. § 805(a)-(b) (Vernon Supp. 2004-2005). The settlement
agreement gives priority to using the Memorial shopping center rents to pay the
interest due on remediation advances, rather than giving priority to the ward. 
          Michael cites no authority for the proposition that a trial court cannot, after
having found that doing so would be in the ward’s best interest, depart in any way
from the terms of section 805 in approving a settlement for the ward. In any event,
the following evidence supports the trial court’s ruling because one reasonably could
conclude from it that both Alta’s needs and the settlement’s terms could be satisfied.
          The Memorial shopping center was appraised at $580,000 without
environmental contamination. The T&C owners’ environmental attorney testified
that the clean-up costs for that property ranged between $250,000 and $1.2 million,
depending upon what would be done, and that the settlement proposal was attempting
to “come up with the cheapest, least cost remedy for this contamination.” Moreover,
Alta’s estate would not necessarily be responsible for the $665,000 maximum
principal provided by the note, but only for the principal amount that was required to
remediate the property and to prosecute the third-party claims: if less than $665,000
was expended to remediate and to prosecute, then less would be borrowed under the
note; if more than $665,000 was expended in remediation (prosecution lending was
capped at $85,000), then the estate’s liability would be capped. And there was the
testimony that the T&C owners’ contractor’s best estimate of the actual remediation
cost was $300,000 to $400,000. There was also evidence that “not one penny” of the
estate’s money would pay for clean-up that did not originate in the Memorial
shopping center. Finally, Hutchison testified that the first year’s interest under the
settlement agreement would be $1,700 monthly and that the estate had other sources
of income to pay that interest. Given this evidence, the trial court reasonably could
have rejected this challenge to the settlement.
          8.       In General
          With respect to each of Michael’s issues, we note that there was also testimony
that the Memorial shopping center had little value as contaminated, that the estate
could not afford to remediate it without the type of arrangement provided by the
settlement, and that the settlement provided the financial means to remediate the
property and to retain its value for the estate. Some testimony also showed that, if the
A-1 contamination on the Memorial shopping center was not remediated, it would
flow toward a nearby residential subdivision. The trial court was thus within its
discretion if it concluded that the settlement afforded the estate a reasonable means
of obtaining financing to remediate the Memorial shopping center and that
remediation was needed both to protect the asset’s value and to prevent potential
lawsuits by nearby residents.
          Moreover, Hutchison testified that he spent about 150 hours working with
various experts and counsel on the T&C owners’ claims; that his experts agreed that
there was a “very reasonable possibility” that the contamination over which the T&C
owners had sued was coming from the A-1 site; that the T&C owners alleged millions
of dollars of damages to them arising from the A-1 contamination; that the settlement
was fair and reasonable for Alta, based upon his discussions with his experts and his
environmental counsel, whom he described as “one of the best environmental lawyers
in the state”; that the settlement was in Alta’s best interest because it gave her
financing to remediate her property and thereby to preserve her equity in it, it
prevented exposing her to “significant” and “huge” potential liability to the T&C
owners and the subdivision residents, she had other sources of income to pay the
interest over the remediation period, he obtained the lowest cap on liability under the
note that he could, and it allowed her to borrow funds and to have assistance in
pursuing A-1 for remediation costs. Given this testimony, the trial court also could
reasonably have concluded that the settlement was in Alta’s best interest.
Conclusion
          We overrule each of Michael’s issues.
          We affirm the order of the trial court.


                                                                        Tim Taft
                                                                        Justice

Panel consists of Justices Taft, Jennings, and Bland.